(Decided March 1st, 1878.)

---

THE COUNTY COMMISSIONERS OF ANNE ARUNDEL COUNTY *vs.* THE ANNAPOLIS AND ELK RIDGE RAILROAD COMPANY.

## TAXATION.

*Act of* 1826, *ch.* 123, *and Act of* 1836, *ch.* 298—*Construction of section five of Charter of Annapolis and Elk Ridge Railroad Company—Exemption of property from Taxation—Exemption of shares of capital stock of a corporation operates as an exemption of the property of the corporation—Exemption from taxation never presumed—Intention to exempt must be evidenced by clear and explicit terms or by necessary implication.*

The Baltimore and Ohio Railroad Company was incorporated by the Act of 1826, ch. 123, and the appellee was incorporated by the Act of 1836, ch. 298. In the latter Act, instead of setting forth at length the various provisions containing the rights, powers and duties with which the corporation

was intended to be invested, and required to execute, reference is made to sections of the previous Act, incorporating the Baltimore and Ohio Railroad Company, for the specification and limitation of many of the rights, powers and privileges granted, as well as duties imposed, and among the sections of the appellee's charter making such reference is the 5th sec., which is as follows: "The *president and directors* of said company shall be, and they are hereby *invested* with all the rights and powers *necessary* to the construction and repair of a railroad from the City of Annapolis to connect with the Baltimore and Washington Railroad, * * * and *for this purpose* the said *president and directors* may *have and use* all the powers and privileges, and shall be subject to the same obligations that are provided in the 14th, 15th, 16th, 17th, 18th, 19th, 20th, 21st, 22nd and 23rd sections of the aforesaid Act, entitled an Act to incorporate the Baltimore and Ohio Railroad Company.

The 18th sec., which is the important one so far as this case is concerned, provides among other things, "that the said road or roads, with all their works, improvements, &c., * * * are hereby vested in the said company incorporated by this Act and their successors forever, and the *shares of capital stock* of the said company shall be deemed and considered personal estate and shall be exempt from the imposition of any tax or burden by the State's assenting to this law."

It was contended by the appellee:

1st. That by sec. 5 of its charter, and the reference therein made to sec. 18 of the Act of 1826, ch. 123, full and complete exemption from all taxation whatever, of the shares of the capital stock of the corporation was given; and

2nd. As the shares of the stock represent the property of the company, both real and personal, therefore all its property is exempt from taxation, whether for State or county purposes. It was HELD:

1st. That if it were true that such exemption was made, then the Act of incorporation accepted by the incorporators created a contract between the State and the incorporators that the State is inhibited by the Constitution of the United States from violating.

2nd. That it is settled by repeated decisions of this Court that the exemption of the shares of the capital stock of the corporation operates as an exemption of the property of the corporation, or so much of it as the corporation is fairly authorized to hold for the proper exercise of its franchises; and this upon the principle that the shares of the stock in the hands of the shareholders represent the property held by the corporation.

594 MARYLAND REPORTS.

County Comm'rs of A. A. Co. *vs.* Annapolis & Elk Ridge R. R. Co.

3rd. That to make out a claim to exemption from the taxing power of the State, so essential to the support of its government, it is necessary to show that the power to tax has been clearly relinquished by the State, and if this has not been done in clear and explicit terms, or by necessary implication, the question whether or not the exemption has been granted must be resolved in favor of the State.

4th. It would seem that the relinquishment of such a power is never to be assumed. It is not said that a State may not relinquish it; that a consideration sufficiently valuable to induce a partial release of it may not exist; but as the whole community is interested in retaining it undiminished, that community has a right to insist that its abandonment ought not to be *presumed*, in a case in which the *deliberate* purpose of the State to abandon it does not appear.

5th. The first clause of sec. 5 of the appellee's charter invested the president and directors of the company with all the rights and powers *necessary* to the *construction and repair of the road.*

But this was a general and undefined delegation of power, which required to be rendered more specific. Hence the section proceeds to declare that, *for this purpose,* that is to say, the construction and repair of the road, the president and directors may *have and use* all the powers and privileges, and shall be subject to the same obligations that are provided in the sections mentioned of the Act incorporating the Baltimore and Ohio Railroad Company.

6th. It is *only* those powers and privileges which were *necessary*, and which the president and directors could hold and use for the construction and repair of the road, that were intended to be granted, and which were defined by reference to the sections of the Act incorporating the Baltimore and Ohio Railroad Company.

7th. The grant of exemption from taxation was not one of the privileges necessary, or in any manner appropriate to be held and used by the president and directors, to enable them to construct and repair the road.

APPEAL from the Circuit Court for Anne Arundel County.

The assessors appointed under the General Assessment Law, (Act of 1876, ch. 260,) assessed and returned to the County Commissioners of Anne Arundel County all the property of the appellee, at a valuation of $100,945.

The latter, under the said Act, (sec. 28,) filed a petition to have the property stricken from the assessment list, upon the ground that the Act of 1836, ch. 298, by which it was incorporated, had engrafted upon its shares of stock the same exemption from taxation which had been engrafted upon the shares of stock of the Baltimore and Ohio Railroad Company, by its Act of incorporation, 1826, ch. 123, sec. 18, and that the exemption from taxation thus granted, protected forever all the property of the appellee from taxation.

The case is more fully stated in the opinion of the Court.

The Court below passed the order, as prayed, striking the property from the assessment list, and the respondents appealed.

The cause was argued before BARTOL, C. J., BOWIE, STEWART, ALVEY and ROBINSON, J.

*H. Aisquith,* for appellant.

It is submitted that reason and authority both show that a tax on the shares and on the property of a corporation is not an unconstitutional double taxation.

And it is submitted, that the just and proper mode of taxation is to tax the shareholder at the market value of his share, and the corporation upon its real and tangible property where located.

While this rule may have some objections, surely it is not as objectionable as the rule now contended for in this State, viz., That a taxation of shares is a taxation of the property. The adoption now of the latter rule by a considered and solemn opinion of this Court, would withdraw from taxation, for county and municipal purposes, all property owned by a corporation whose shareholders resided in the State, but not in the county or city where the property was located, and absolutely withdraw from all

taxation all property owned by insolvent corporations; and place forever unequal and unjust burthens upon the already overburdened individual property owners in the counties and State.

If, as is erroneously contended, the shares of stock of a corporation represent the property of a corporation just as the capital of a man represents his property, so the property of a man represents his capital, and of a corporation its shares of stock, and as the proportion of a man's capital that is invested in United States Bonds, or in mortgages, is exempt from taxation, so it must follow that to the extent that the capital of a corporation is invested in United States Bonds, or mortgages, to that extent the shares must be exempt. It is perfectly apparent that if the first proposition be true, the second must also be true; and it is equally apparent that if the second proposition be false, the first must also be false.

The second proposition, which of course includes the first, was most ably argued by Messrs. Evarts, Sedgwick, Tremain and others, in favor of the exemption from taxation of the shares of a national bank, to the extent that its capital was invested in United States Bonds, and by Messrs. Kernan, A. J. Parker and Reynolds, against it in *Van Allen vs. Assessors*, 3 *Wall.*, 573, and the Court, in an able opinion, (584,) decided against the proposition, and held the shares to be one property with one ownership, and the property of the bank another property with a different ownership—decided in 1865.

These same propositions were elaborately argued in 1874, in this Court, in *Emory vs. State*, 41 *Md.*, 38. That was a case in which the capital of a corporation, or a large portion of it, was invested in mortgages, yet the Court held that the shares were not exempt.

*We claim these two principles to be established:*

1. That shares do not represent the property of a corporation for purposes of taxation: this we claim to have estab-

lished by reason, by the English decisions, (1837, 2 *Y. & C.*, 295; 1846, 9 *Ad. & E.*, 817; these two cases decided before 1848, 6 *Gill;* 1854, 10 *Exch.*, 236,) by a decision of *S. C., of U. S.*, 3 *Wall.*, and practically by a decision of this Court, *Emory vs. State*, 41 *Md.*, 38.

2. That exemptions are strictly construed, and no right of taxation is surrendered, unless the intention to surrender is manifested in words too plain to be mistaken, is well settled. *Billings vs. The Providence Bank*, 4 *Peters*, 561.

Bearing these two principles in mind, let us consider as a new question the clause of exemption, viz., "The *shares* of the capital stock of the said company shall be deemed and considered personal estate, and shall be exempt from the imposition of any tax or burthen by the State's assenting to this law," would it occur to any mind illuminated with the light of the present decisions, or even the two English decisions before 1848, that anything but the shares, made personal property by the very exemption, were exempted in the hands of the shareholders? It is believed that shares at that time were taxed at their par value, if not, they could have been so taxed at any time by statute.

Was it not a most liberal inducement to subscribe, to say to a man, put your $100 in this corporation, and it will not be taxed, no matter how valuable it may become, you will not be taxed on the share? Could the Legislature have meant to exempt the real and tangible personal property of the corporation? If the rule of taxation, as we believe, is right, when there is no exemption, viz., to tax the share and tax the property, was it not most liberal in the Legislature, and all that could be claimed under a fair, and especially under a strict construction of the language, only to tax the property of the corporation, and allow the shareholders, unlike the shareholders of other corporations, to escape all taxation? Is it not a

strained construction, that could only arise from wrong premises and wrong reasoning, that would seek to give a more liberal construction as to what the Legislature intended?

It is true that *Mayor, &c. vs. B. & O. R. R. Co.,* 6 *Gill,* 289, decides differently. We need not here advert to the fact of the great benefit and relief that would accrue to the tax-payers of the entire State from a reversal of that opinion? The Maryland Judiciary have been noted for their ability in discovering error, and their manly bravery in exposing and correcting it, even when found in their own opinions. It is this capability of discovering, acknowledging and correcting error that distinguishes greatness from mediocrity. It is of all things the most essential quality of a Judge of a Court of last resort. It is this quality that enables the *strong* Judge to shake off and set aside the *"ita lex scripta,"* which a *weak* one too often unfortunately shields himself behind, and fears to controvert, although conscious that it works hardship to the people, and should never have been so written. Is there not too great a tendency in lawyers and Courts to give weight to decided cases without investigating as closely as they ought the soundness of the principles upon which the decision is based?

We have no hesitancy then in asking this Court to reverse 6 *Gill,* if we can show them that the opinion in that case was based on wrong assumptions and the application of wrong principles of law.

We claim there were two radical errors in the opinion in that case upon which the whole force of the opinion rests.

1. It is assumed, (page 296,) that the shares for purposes of taxation represent the property of the company.

2. On page 297, after assuming what was the intention of the Legislature *twenty years* after it was declared, the Court says, "In expounding, therefore, those provisions of the charter of the company, by which its expressed privileges and *exemptions* are imparted, *liberal rules* of in-

terpretation for *its* benefit ought to be adopted to effectuate the benevolent designs of the Legislature."

Can a single authority be found anywhere to support *liberal* rules of interpretation of an exemption from taxation? Does not every case, from 4 *Peters*, 561, down to 21 *Wall.*, 498, establish the contrary doctrine of a strict, the most strict construction? When a judge announces, and a Court allows such a palpably erroneous principle to be announced, must it not materially affect, if not destroy, the force of the whole opinion?

It follows then that this Court must now say that either the first assumption in 6 *Gill*, in reference to shares, is wrong, or that the three English cases, (two decided before 6 *Gill*,) and the S. C. of the U. S., are wrong; which do the Court think is entitled to the most weight?

And they must also say that a liberal construction of an exemption is wrong, or that all their own decisions, the decisions of the Supreme Court, and almost every Court in the land, that exemptions are not to be presumed, all presumptions are against them, and the strictest construction of which the language is capable applied to them, are wrong.

If 6 *Gill*, decided in 1848, was wrong, as we claim to have shown, then for thirty to fifty years, the most powerful and richest "person" in the State has paid no taxes upon property of which it was the "sole owner," and was by the exemption from his or its legitimate burthens enabled to pay enormous interest to the individuals who advanced to it the money to conduct its business. Can those individuals now complain, after enjoying those great benefits, to which they were not entitled, if they receive less interest, because the property of this great "person" is made to bear in the counties and cities where located, according to the Act of 1876, ch. 159, its just proportion of contribution for the protection it receives?

So far as the shareholders of the appellee are concerned, the road being hopelessly insolvent, and the shares valueless, they will not be affected in the least by the decision in this case.

Let us now turn and examine the cases *seriatim,* which are claimed to decide that shares represent property—they will be found collected in 41 *Md.*, *page* 49.

*The Tax Cases,* 1841.—12 *G. & J.,* 117. It is to be regretted, that in a case involving so many important principles, we are left to gather from the head-notes, which may or may not be exactly correct, and the argument of counsel, what questions the Court did actually consider. The fact that no written opinion was delivered, and no reasons assigned, greatly lessens the weight that must attach to any decision claimed in that case. Although the banks, in this case, were paying a tax or bonus for their franchise, under Act 1821, ch. 131, which was a part of the valuable property of said banks, yet the Court decided that its shareholders could be taxed. This opinion was, however, reversed, and the banks exempted from taxation, in *Gordon vs. Appeal Tax Court,* 3 *How.,* under their construction of the contract created by the Act.

*Gordon vs. M. & C. C.,* of *Balto.* 1847.—5 *Gill,* 231. Gordon was a shareholder in the Union Bank. The question presented and decided was that the contract of exemption held by 3 *How.,* to be made by Act of 1821, ch. 131, sec. 11, only applies to State tax, and not to city tax. No question of the taxation of property and shares was presented or decided, and all that was said on that subject was extraneous *dicta,* and should have little or no weight.

*Mayor, &c. vs. B. & O. R. R. Co.,* 1848.—6 *Gill,* has been discussed. *State vs. Stirling,* 1863.—20 *Md.,* 515. This was a case of a savings bank, incorporated by Act 1818, ch. 93, and a tax levied upon the bank for deposits. The Court, page 518, draws a distinction between savings banks and other corporations, and held

that "this bank charter contemplated deposits and investments to be one and the same." It does not establish the principle it is cited to support.

*Insurance Co. vs. Mayor & C. C. of Balto.*, 1865.—20 *Md.*, 296. It was contended in this case that the corporation in its entirety owned its capital stock, and the Court decided it did not.

It is nowhere said that the shares represent the property, the reasoning of the Court rather tends the other way.

We claim then that these cases, upon examination in this Court, do not establish the doctrine that shares represent property.

*P. H. Tuck* and *Wm. H. Tuck*, for appellee.

The appellee contends that, according to the proper construction of its charter, (1836, ch. 298,) and the charter of the Balto. & O. R. R. Co., (1826, ch. 123,) all its property is exempted from taxation, and that the Legislature had no power to direct it to be assessed for the purpose of being taxed, as proposed by the Acts of 1876, ch. 260, and ch. 159.

On the part of the appellee, the following points are submitted:

1st. The privilege of exemption in the 18th section of the B. & O. R. R. Co's charter, is a part of the charter of the appellee.

It is worthy of notice, that if the sections of the B. & O. R. R. charter, mentioned in the 3rd and 5th sections of the appellee's charter, are not incorporated into it, then the appellee had no grant of authority even to make the road, for these very sections contain the only powers, and prescribe the only means by which any such company can be formed, or any such road constructed.

It is only necessary to read sections 3, 4, 6, 7, 8, 9, 10, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, of the Act

of 1826, ch. 123, to see how absolutely necessary the powers thereby granted to the Baltimore and Ohio Company were, to enable it to make that road; all of which sections are referred to in the Act of 1836, ch. 298. If these *nineteen* sections were taken from the Act of 1826, the remaining *four* would be a charter only in name; and if the appellee is denied the use of the powers thereby intended to be conferred, its charter would be equally unavailing for the purpose for which the Act of 1836 was passed.

It is manifest upon the words of the Act of 1836, that the Legislature intended to incorporate a company to make a road from Annapolis to connect with the Baltimore and Washington road; and the only inquiry on this part of the case is, whether by the terms of the 5th section, sections 14 to 23 inclusive of the Act of 1826, were incorporated into and made parts of that of 1836. If it had been declared that these sections should be incorporated into, or be considered as portions of the charter, there could have been no question on the subject. Now, if the language employed does not mean the same thing, what does it mean? For what purpose was it used by the Legislature, if not to enable the company by exercising the powers mentioned in these quoted sections, to accomplish the very thing the State had in view in granting the charter?

The fact that the 5th section says that the *President* and *Directors* may have the powers, &c., mentioned in the Baltimore charter, instead of giving these powers to the company by its corporate name, can make no difference. The corporate name is the Annapolis and Elk Ridge Railroad Company, but all the powers are to be exercised by the president and directors of the company. Every corporation acts by its officers and agents, because it can act in no other way. Indeed, if the powers had been given to the company, it might have been contended with as much reason

that it could not be exercised because the instrumentalities had not been named. But the B. & O. R. R. Co. for fifty years had been doing these very things under grants of power expressed in the same language, without being once challenged in the many controversies which it has maintained or defended in the Courts of the State and United States, from its suit with the Canal Company, to the present time. Every survey, every location, every condemnation was an act of trespass : and the same may be said of most of the acts of the officers of that company, if the objection now made on the part of the appellants be well taken.

2. The exemption of the shares of stock mentioned in the 18th section of Balto. & Ohio R. R. charter, being part of the appellee's charter, such exemption protects all its property from assessment and taxation.

In *Fletcher vs. Peck*, 6 *Cranch*, 164, it was decided that a grant of lands by a Legislature was a contract, and that a subsequent Legislature could not divest rights acquired under the grant.

In the *Dartmouth College Case*, 4 *Wheaton*, 519, it was decided that the charter of a private corporation was a contract within the protection of the 10th section of the 1st Article of the Constitution of the U. S.; the obligations of which could not be impaired by subsequent legislation, without the consent of the corporators. Since that time to the present the same doctrine has been uniformly applied to the railroad charters. There have been decisions also on the specific question whether one Legislature has the power, in a private charter, to relinquish the right of taxation, so as to prevent its exercise by a subsequent Legislature. And although in some of the State Courts, and some of the Judges of the Supreme Court, this power has been questioned, we maintain that in Maryland the affirmative of the doctrine is fully established, in accordance with the decisions of the Supreme Court of the United States, where the question is considered in the fol-

lowing cases : *State Bank of Ohio vs. Knoop*, 16 *How.*, 369 ; *Ohio Life Ins. Co. vs. Debolt*, 16 *How.*, 431 ; *Jefferson Br. Bank vs. Skelly*, 1 *Black*, 436 ; 3 *Wallace*, 583 ; *McGee vs Mathias*, 4 *Wall.*, 143 ; *Home of the Friendless vs. Rouse*, 8 *Wall.*, 430 ; *Washington University vs. Rouse*, 8 *Wall.*, 439 ; *Washington R. R. vs. Reid*, 13 *Wall.*, 264 ; *Humphrey vs. Peques*, 16 *Wall.*, 244 ; *Phila. & W. R. R. vs. Maryland*, 10 *How.*, 393.

This particular point was discussed and decided for the first time in *Knoop's Case*, 16 *How.*, 406, and *Debolt's Case*, 16 *How.*, 431. In both, Justices DANIEL, CATRON and CAMPBELL, denied the power *in toto ;* Ch. J., TANEY, (Justice GRIER, concurring,) also denied the power, unless it was conferred on the Legislature by the State Constitution, but in *Knoop's Case*, they concurred with Justices McLEAN, WAYNE and CARTER, in maintaining the exemption, because the power to exempt had been given by the Constitution of Ohio of 1802, which was in force at the time the charter in question was granted, the three Judges last named affirming the right to the exemption on the ground of contract, and without reference to the Constitution. This was in 1853. The subject was considered again in 1861, and the views before expressed adhered to. Later, in 1869, 8 *Wallace*, 443, the decision in *Knoop's Case* was affirmed, Ch. J. CHASE and JJ. MILLER and FIELD, dissenting. In 1871, 13 *Wall.*, 264 ; in 1872, 16 *Wall.*, 244, the point was treated as *res adjudicata*.

Prior to these decisions this Court in the *Tax Case*, 12 *G. & J.*, 117, had passed upon this very question when presented by an exemption clause in the charter of the Balto. and Susq. R. R. Co., containing the very words by force of which the appellee claims its exemption, and which same language was afterwards passed upon in *Mayor, &c. vs. B. &. O. R. R. Co.*, 6 *Gill*, 289.

The Legislature had passed revenue laws under which it was sought to levy and collect taxes from these railroad

OCTOBER TERM, 1877. 605

County Comm'rs of A. A. Co. *vs.* Annapolis & Elk Ridge R. R. Co.

companies, and the cases referred to show that the very question now presented was in affirmance of the validity of the exemption.

In 12 *G. & J.*, it was held that the exemption of the stock also exempted bank stock held by the Baltimore and Susquehanna R. R. Co. (Pp. 118, 141, 142, 157.)

In 6 *Gill*, 289, the same question was decided as to the *B. & O. R. R. Co.*, as shewn by the prayers and opinion of the Court, and no other was presented. It is not necessary to inquire whether a law merely exempting certain property from taxation can be repealed. That is not this case. We maintain that here the exemption is part of a private charter—a contract—which is protected by the Federal Constitution, without looking for a consideration outside the objects for which the corporation was created. 8 *Wallace*, 437.

It will be observed that the averment in the petition, and the admission in the answer, show that the property sought to be taxed is indispensable to the permanence and working of the road, and does not belong to the class of cases referred to in 8 *Wallace*, as to property not essential for such purposes.

It is respectfully submitted, that the order below will be affirmed.

*Charles J. M. Gwinn*, Attorney-General, for appellant, in reply.

The appellee in its petition relies exclusively upon the fifth section of the Act of 1836, ch. 298, as establishing its claim to exemption from taxation.

That section conferred upon the *president and directors* of the appellee, all the rights and powers necessary to the construction and repair of a railroad from the City of Annapolis to a point on the Baltimore and Washington Railroad, and for this purpose invested them with the powers and *privileges*, and subjected them to all the obli-

gations "provided" in the 14th, 15th, 16th, 17th, 18th, 19th, 20th, 21st, 22nd and 23rd sections of the charter of the Baltimore and Ohio Railroad Company.

The 18th section of the Act of 1826, ch. 123, incorporating the Baltimore and Ohio Railroad Company, conferred varied powers and privileges upon the *president and directors* of said Company, in order to enable it to construct and repair its railroad, to all of which the appellee, under the 5th section of its charter, 1836, ch. 298, became entitled. There were other provisions in that section, which conferred privileges upon the stockholders of that company. It is believed the president and directors of the appellee cannot claim or enjoy these particular privileges under the 5th section of the Act of 1836, ch. 298, because they were not granted to the president and directors of the Baltimore and Ohio Railroad Company, under the Act of 1826, ch. 123, sec. 18; and that they cannot be claimed or enjoyed by the stockholders of the appellee, because they were not granted to such stockholders by the 5th section of the Act of 1836, ch. 298.

The provision to which we refer is contained in the last clause of the 18th section of the Act of 1826, ch. 123. It reads as follows : "The shares of the capital stock of the said company shall be deemed and considered personal estate, and shall be exempt from the imposition of any tax or burthen by the State's assenting to this law."

This provision engrafts an immunity from taxation only upon the shares of stock of the corporation.

It confers no right, power, or privilege upon the president and directors of such corporation. If the corporate body derives any benefit from the immunity thus granted to its shares of stock, in the hands of the holders of such stock, that benefit is an incidental advantage only, and is not the result of any direct grant of corporate immunity from taxation.

If the General Assembly had intended that the stockholders of the appellee should enjoy all the immunities

which were conferred upon the stockholders of the Baltimore and Ohio Railroad Company by the 18th section of the Act of 1826, ch. 123, it would have declared that intention in precise and definite language. It cannot be pretended that it has so done. The slightest examination of the text of section 5 of the Act of 1836, chap. 298, is sufficient to show that the words, under which the exemption is claimed, are capable of different constructions. The doubt, thus arising, is conclusive against the claim of the appellee to exemption from taxation.

It is settled law that the taxing power of a State is never presumed to be relinquished, unless the intention to relinquish it is declared in clear and unambiguous terms. The State cannot strip itself of its essential right and power of taxation by doubtful words. The enactment must distinctly exempt from taxation the particular property for which such exemption is claimed. *Mayor and C. C. vs. B. & O. R. R. Co.*, 6 *Gill*, 292; *Providence Bank vs. Billings*, 4 *Peters*, 561; *Phila. & Wilm. R. R. Co. vs. Maryland*, 10 *Howard*, 393; *Society of Savings vs. Coite*, 6 *Wallace*, 606; *North Missouri R. R. vs. Maguire*, 20 *Wallace*, 61; *Erie R. R. Co. vs. Penn*, 21 *Wallace*, 498; *Cooley on Taxation*, 54, and cases cited in *note* 2.

The Court will observe that the appellee was authorized by the Act of 1872, chap. 425, to extend its road to the harbor of the City of Annapolis, or to any of the waters adjacent thereto, or to any wharf, or point adjacent to said harbor, or waters, and to purchase or build certain wharves or piers.

The property which the appellee was authorized to acquire, under this new power, was not exempted from taxation.

While the petition of the appellee avers that it is not the owner of any property, held for a purpose different from that specified in the Act of 1836, chap. 298, it does not assert that it did not acquire any of the property

608 MARYLAND REPORTS.

County Comm'rs of A. A. Co. *vs.* Annapolis & Elk Ridge R. R. Co.

assessed to it under the powers conferred by the Act of 1872, chap. 425.

Every reasonable presumption must be made against its claim for immunity from taxation. *Gordon's Ex. vs. Mayor and City Council of Baltimore,* 5 *Gill,* 237, 238, citing *Providence Bank vs. Billings,* 4 *Pet.,* 561; *Mayor & City Council vs. Balto. and Ohio R. R. Co.,* 6 *Gill,* 292; *Mayor, &c. vs. State,* 15 *Md.,* 391, 392, 467; *Balto. & Ohio R. R. Co. vs. Marshall Co.,* 3 *W. Va.,* 319; *Balto. & Ohio R. R. Co. vs. Wheeling,* 3 *W. Va.,* 372; *Delaware Railroad Tax Case,* 18 *Wallace,* 226; *North Missouri Railroad Company vs. Maguire,* 20 *Wallace,* 61; *Ohio Life Insurance Co. vs. Debolt,* 16 *Howard,* 435; *Jefferson Bank vs. Skelly,* 1 *Black,* 446.

There is nothing in the record in this case to show what portion of the property of the appellee, included in the assessment, was acquired under the Act of 1872, chap. 425, and what portion was acquired under its original charter.

ALVEY, J., delivered the opinion of the Court.

This appeal is from an order of the Circuit Court of Anne Arundel County, directing certain property to be stricken from the list of assessment and valuation, made under the Acts of 1876, ch. 159, and 1876, ch. 260; both Acts relating to the assessment and valuation of the taxable property of the State, and, taken together, form one system of assessment.

The question presented is, whether the property, real and personal, of the appellee, found within the limits of Anne Arundel County, and assessed, under the provisions of the Act of 1876, ch. 159, for county purposes, is liable to such assessment? The appellee is a railroad corporation, working its road by steam power; and the line of its road extends from the City of Annapolis to a point of intersection with the Washington branch of the Baltimore

and Ohio Railroad, known as the Annapolis Junction; the whole line being within the County.

The Baltimore and Ohio Railroad Company was incorporated by the Act of 1826, ch. 123, and the appellee was incorporated by the Act of 1836, ch. 298. In the latter Act, instead of setting forth at length the various provisions containing the rights, powers, and duties, with which the corporation was intended to be invested, and required to execute, reference is made to sections of the previous Act incorporating the Baltimore and Ohio Railroad Company, for the specification and limitation of many of the rights, powers and privileges granted, as well as duties imposed; and among the sections of the appellee's charter making such reference is the 5th, which is as follows: "That the *president and directors* of the said company shall be, and they are hereby *invested* with all the rights and powers *necessary* to the construction and repair of a railroad from the City of Annapolis to connect with the Baltimore and Washington Railroad, not exceeding sixty-six feet in width, with as many sets of tracts as the said president and directors, or a majority of them, may think necessary, and, *for this purpose*, the said *president and directors* may *have and use* all the powers and privileges, and shall be subject to the same obligations, that are provided in the fourteenth, fifteenth, sixteenth, seventeenth, eighteenth, nineteenth, twentieth, twenty-first, twenty-second and twenty-third sections of the aforesaid Act, entitled an Act to incorporate the Baltimore and Ohio Railroad Company."

The 14th, 15th, 16th and 17th sections of the Act of 1826, ch. 123, just referred to, are devoted to specifying and defining the rights and powers with which the president and directors of that company were and are invested in order to enable them to procure the right of way, and construct, and keep in repair, a railroad from the City of Baltimore to the river Ohio, and defining the duties and obligations incident thereto; and among the powers

granted, were those to build bridges, erect warehouses, fix scales, and also to make lateral roads in any direction whatever, in connection with the main line of said road. The 18th section, which is the important one so far as this case is concerned, provides, in the first place, that the president and directors of the company should be invested with power to purchase, with the funds of the company, all necessary machines, carriages, and other means of transportation for the operation of the road : In the second place, that the president and directors should have power to charge and exact tolls at certain fixed rates per mile, for the transportation of persons and freight on and over the road between its *termini:* In the third place, that it should not be lawful for any other company, or any person whatever, to use or travel upon the road without the license or permission of the president and directors of the company ; and then follow these two distinct clauses, which, as will be observed, contain no delegation of powers or privileges to the president and directors of the company, but declare "that the said road or roads, with all their works, improvements and profits, and all the machinery of transportation used on said road, are hereby vested in the said company incorporated by this Act, and their successors forever ; and the *shares of the capital stock* of the said company, shall be deemed and considered personal estate, and shall be exempt from the imposition of any tax or burthen by the State's assenting to this law."

Now, it is contended by the appellee, that, by the 5th section of its charter, and the reference therein to the 18th section of the Act of 1826, ch. 123, full and complete exemption from all taxation whatever. was given of the shares of the capital stock of the company ; and, as the shares of the stock represent the property of the company, both real and personal, therefore all its property is exempt from taxation, whether for State or county purposes.

There is no other provision or reference in the appellee's charter upon which reliance is placed to support the claim to exemption, and whether such claim be well founded or not, depends upon the proper construction of the 5th section of the charter before recited.

If it be true, as contended by the appellee, that such exemption was made, then the Act of incorporation, accepted by the corporators, created a contract between the State and the corporators that the State is inhibited, by the Constitution of the United States, from violating; and it is settled, by repeated decisions of this Court, which we are not disposed to disturb, that the exemption of the shares of the capital stock operates as an exemption of the property of the corporation, or so much of it as the corporation is fairly authorized to hold for the proper exercise of its franchises; and this upon the principle that the shares of the stock in the hands of the shareholders represent the property held by the corporation.

But did the State, by the Act of incorporation of the appellee, surrender its power of taxation, and afford good ground for the claim of exemption now made?

Before proceeding to a more particular examination of the terms of the statute, and the nature of the powers and privileges granted, it is well to refer to the settled principle of construction that applies in a case like the present.

This, it must be borne in mind, is the case of a corporation deriving its existence and all its powers and franchises from the State, and which holds its property under the protection of the State, but which asserts and claims that the State has surrendered all its taxing powers over the shares of the capital stock and property of the corporation. To make out the claim to this exemption from the taxing power of the State, so essential to the support of its government, it is incumbent upon the corporation to show that the power to tax has been clearly relinquished by the State; and if this has not been done in clear and explicit

terms, or by necessary implication, the question whether or not the exemption has been granted, must be resolved in favor of the State. *Wilmington R. R. Co. vs. Reid,* 13 *Wall.,* 264.

In the case of the *Providence Bank vs. Billings & Pittman,* 4 *Pet.,* 514, a leading case upon the subject, there was a claim to exemption from taxation set up by a corporation as against the State creating it; and the Supreme Court, speaking by Chief Justice MARSHALL, in passing upon the question of the relinquishment of the taxing power by the State, said: "It would seem that the relinquishment of such a power is never to be assumed. We will not say that a State may not relinquish it; that a consideration sufficiently valuable to induce a partial release of it may not exist; but as the whole community is interested in retaining it undiminished, that community has a right to insist that its abandonment ought not to be presumed, in a case in which the *deliberate* purpose of the State to abandon it does not appear." And in the case of the *Philadelphia and Wilmington R. R. Co. vs. The State of Maryland,* 10 *How.,* 376, the case of a Maryland corporation resisting the enforcement of a Maryland tax law, upon claim of exemption, Chief Justice TANEY, as the organ of the Court, said; "Certainly there is no reason why the property of a corporation should be presumed to be exempted, or should not bear its share of the necessary public burdens, as well as the property of individuals. This Court, on several occasions, has held, that the taxing power of a State is never presumed to be relinquished, unless the intention to relinquish is declared *in clear and unambiguous terms.* In the Act incorporating this company, there is nothing from which an inference could possibly be drawn; and, standing upon its charter alone, the tax was, without doubt, lawfully imposed." The principle of these cases has been recognized and asserted by this Court on more than one occasion.

Now, with this principle of construction in mind, and conceding that the word *privileges* is comprehensive enough, when used in a proper connection, to include the immunity claimed, what powers and privileges were granted by the 5th section of the appellee's charter? It will be observed that the first clause of that section invested the president and directors of the company with all the rights and powers *necessary* to the *construction and repair of the road.* But this was a general and undefined delegation of power, which required to be rendered more specific. Hence the section proceeds to declare, that, *for this purpose*, that is to say, the construction and repair of the road, the president and directors may *have and use* all the powers and privileges, and shall be subject to the same obligations, that are provided in the particular sections mentioned of the act incorporating the Baltimore and Ohio Railroad Company. And without attempting to specify all the several powers and privileges thus conferred upon the appellee, it is all-sufficient for this case, that we should conclude as we do, that it is *only* those powers and privileges which were necessary, and which the president and directors could hold and use for the construction and repair of the road, that were intended to be granted, and which were defined by reference to the sections of the act incorporating the Baltimore and Ohio Railroad Company. In these sections were to be found the grants of power to exercise the right of eminent domain, under proper limitations and restrictions; so the privilege of crossing other roads; and the taking materials for the construction and repair of the road. But that *all* the powers and privileges granted by the sections referred to were intended to be conferred upon the appellee, by the reference to those sections, is a proposition that we cannot adopt for a moment. For instance, the power to make lateral roads was certainly not intended to be granted to the appellee; nor can it be maintained that the power

614          MARYLAND REPORTS.

County Comm'rs of A. A. Co. *vs.* Annapolis & Elk Ridge R. R. Co.

to regulate tolls, under the restrictions imposed by the 18th section of the Baltimore and Ohio Railroad Company's charter, was adopted as applicable to the appellee ; for the subject as to the rates of tolls is provided for by the 6th section of the appellee's charter. And certainly it was not intended, by the grant of powers and privileges to the president and directors, for the purposes expressed, to invest them with all the property of the company, instead of vesting it in the company, as is done by the 18th section of the Act of 1826, ch. 123. It is therefore clear that the powers and privileges granted, by reference to the 18th section of the Act of 1826, ch. 123, were only those necessary for the construction and repair of the road ; and as the grant of exemption from taxation was not one of the privileges necessary, or in any manner appropriate, to be held and used by the president and directors, to enable them to construct and repair the road, it follows that the exemption claimed was not conferred upon the appellee. Indeed, from the terms employed in the 5th section of the charter, it is impossible to say, that it was the *deliberate* purpose of the State to abandon its power of taxation, and that such purpose *is clearly and unambiguously* expressed by the Legislature ;—conditions, as we have seen, essential to the support of the claim of exemption asserted by the appellee. If the Legislature had really intended to surrender the State's right of taxation, we cannot suppose that so important a matter would have been left in the least doubt, or in any manner dependent upon construction, but would have been plainly expressed. And as affording additional support to the conclusion that the taxing power was not designed to be relinquished in the grant of the appellee's charter, we may refer to legislation of the State which was recent at the time such charter was granted, and the position that the State had assumed in regard to its powers of taxation.

The legislation to which we refer is the Act known as the eight million loan bill, passed on the 4th of June, 1836. That Act was passed to aid and promote the works of internal improvements that had been undertaken in the State ; and it provided for the issue of State stock or bonds to the amount of eight millions of dollars, which the State would be bound to redeem. By the 15th section of that Act, it was declared, with a view manifestly of giving support to the credit of the State, that should it become necessary to levy a direct tax for the support of the government or to sustain the public credit, such tax should be laid according to the 13th Article of the Declaration of Rights, on all property of every kind and description whatever, found within the State ; and the faith of the State was thereby expressly pledged to lay such tax accordingly, and to provide for the payment of its debts, principal and interest ; and all Acts or parts of Acts in contravention of the constitutional and equitable principles therein contained, were declared to be thenceforth repealed, abrogated and annulled. Within less than a year after the passage of this Act, the appellee obtained its charter ; and it is not probable, or fair to suppose, in the absence of a plain and direct expression to the contrary, that the Legislature either deliberately designed a breach of the pledge solemnly made but a few months before, or a departure from the policy so emphatically declared, or that it would have entertained a proposition to do so, with respect to a corporation like the appellee. Especially is this not to be supposed in regard to the charter of the appellee; as, by the 10th section of that charter, the eight million loan Act is referred to in terms, and the subscription to the capital stock of the company, authorized to be made by the treasurer of the State, was required to be paid out of money that might be realized under the eight million loan Act, and that alone. The appellee was, therefore, a recipient of a part of the very funds for which the faith of

the State stood pledged that no property within her border should escape taxation.

Being of opinion that the property mentioned in the appellee's petition, and which was ordered to be stricken from the list of assessment and valuation, is legally subject to such assessment and valuation, the order appealed from will be reversed, and the appellee's petition dismissed.

*Order reversed, and*
*petition dismissed.*

(Decided March 1st, 1878.)